[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] STIPULATION OF FACTS
 SCHEDULE A
1. The original complaint in this matter was dated June 19, 1995. (Exh. 1, R, p. 4).
2. After the June 19, 1995 complaint was stricken, plaintiff repleaded by complaint dated October 13, 1995. (Exh. 2, R, p. 11).
3. The Town of Southington ("Town") bought the property located at Captain Lewis Drive (the "Property") by deed dated June 27, 1995 from the Resolution Trust Corporation (Exh. 3, Trial Exh. E for deed and transcript ("TR"), October 1, 1997, p. 29 and October 7, p. 18). The Town had been the successful bidder at an auction conducted on behalf of the Resolution Trust.
4. The Town paid $352,450 for the Property. (Exh. 4, TR., Oct. 7, 1997, p. 27).
5. At the time of the original trial in October 1997, the Town had sold four of the eleven lots of the subdivision.
6. The sale prices of each of the lots sold by the Town at the time of the original trial were: $41,200; $36,800; $76,000; $51,600. (Exh. 5A-D, Trial Exhs. F, G, H, and I). CT Page 10109
7. The average sales price per acre for the four lots sold at the time of trial was $40,000. (Exh. 6, TR, October 7, 1997, p. 23).
8. The Town purchased the Property for purposes of economic development, according to the testimony at the trial by Michelle Stronz, Economic Development Consultant for the Town. (Exh. 7, TR, October 7, 1997, pp. 16-18).
9. The Town did not assess what the market value of the lots might be if the Town were the successful bidder for the Property (Exh. 7, TR, October 7, 1997, p. 17).
10. In purchasing the Property, the Town was interested in helping small to midsize manufacturers grow their businesses in Southington. (Exh. 7, TR, October 7, 1997, p. 18).
11. The Town was one of several bidders on the tract of land known as the Captain Lewis Drive Subdivision.
12. The Town acquired the land known as the Captain Lewis Drive Subdivision through foreclosure and became, in effect, a successor developer of the Subdivision.
13. The subdivision was for the purpose of industrial development.
TOWN OF SOUTHINGTON COMMERCIAL UNION INSURANCE COMPANY
By: Marjorie Wilder, Esq. By: Bradford R. Carver, Esq.
[EDITORS' NOTE: JUDGES' SIGNATURE IS ELECTRONICALLY NON-TRANSFERRABLE.]
Exhibit 1
RETURN DATE: JULY 11, 1995 : SUPERIOR COURT
TOWN OF SOUTHINGTON : J.D. OF HARTFORD/NEW BRITAIN v. : AT NEW BRITAIN COMMERCIAL UNION INSURANCE COMPANY : JUNE 19, 1995
 COMPLAINT
1. Plaintiff, Town of Southington ("Town") is a duly chartered municipal corporation within the State of Connecticut. CT Page 10110
2. Defendant, Commercial Union Insurance Company ("Commercial Union"), is a Massachusetts corporation, licensed to conduct surety business in the State of Connecticut.
3. On or about October 4, 1988, upon the application of A.M.I. Industries, Inc., the Town, acting through its Planning and Zoning Commission (the "Commission") approved an eleven (11) lot industrial subdivision of real property located at Captain Lewis Drive (the "Subdivision").
4. As a condition of its approval, the Commission required A.M.I. to construct substantial public improvements within the subdivision, including roads, a drainage system, utilities and other improvements (collectively the "Improvements"). The estimated cost to construct the Improvements, as of October 13, 1988, was $590,000.00.
5. As a further condition of its approval, the Commission required A.M.I. to post with the Town a surety bond, in the amount of $590,000.00, to insure the complete and proper installation of the Improvements.
6. On or about November 1, 1988, Commercial Union, acting through its duly authorized agent and attorney in fact, issued to the Town its Subdivision Bond No. CJ7127048, in the amount of $590,000.00 (the "Bond"), to insure the proper completion of the Improvements. A copy of the Bond is attached to this Complaint as Exhibit A.
7. Between November 1, 1988 and November 30, 1990, A.M.I. completed construction of a portion of the Improvements. Based upon work in place, on or about December 18, 1990, the Commission reduced the principal amount of the Bond from $590,000.00 to $357,000.00.
8. A.M.I. has failed to complete construction of the Improvement in accordance with the requirements of the Subdivision approval and applicable Connecticut law.
9. The current estimated cost to complete the Improvements is $303,757.00.
10. By letter dated April 7, 1995, the Town notified Commercial Union that the Improvements had not been completed as require and called the Bond.
11. Despite demand by the Town, Commercial Union has failed an refused to honor its obligations under the Bond. CT Page 10111
WHEREFORE, plaintiff claims:
1. Money damages;
2. Statutory interest; and
3. Costs.
 PLAINTIFF, Town of Southington
 By: Thomas A. Rouse Pullman Comley, LLC 850 Main Street, P.O. Box 7006 Bridgeport, CT 06601-7006 Juris #47892 330-2000
Exhibit 2
CV-95-0468283 S : SUPERIOR COURT
TOWN OF SOUTHINGTON : J.D. OF HARTFORD/NEW BRITAIN v. : AT NEW BRITAIN COMMERCIAL UNION INSURANCE COMPANY : OCTOBER 13, 1995
 COMPLAINT
FIRST COUNT
1. Plaintiff, Town off Southington ("Town") is a duly chartered municipal corporation within the State of Connecticut.
2. Defendant, Commercial Union Insurance Company ("Commercial Union"), is a Massachusetts corporation, licensed to conduct surety business in the State of Connecticut.
3. On or about October 4, 1988, upon the application of A.M.I. Industries, Inc., the Town, acting through its Planning and Zoning Commission (the "Commission.") approved an eleven (11) lot industrial subdivision of real property located at Captain lewis Drive (the "subdivision")
4. As a condition of its approval, the Commission required A.M.I., its CT Page 10112 successors or assigns, to construct substantial public improvements within the subdivision, including roads, a drainage system, utilities and other improvements. (collectively the "Improvements"). The estimated cost to construct the Improvements, as of October 13, 1988, was $590,000.00.
5. As a further condition of its approval, the Commission require A.M.I., its successors or assigns, to post with the Town surety bond, in the amount of $590,000.00, to insure the complete and proper installation of the Improvements.
6. At some point between October 4, 1988 and November 1, 1988, the exact date being unknown to plaintiff at this time, A.M.] assigned or otherwise transferred its interest in to Subdivision to Michael J. Martinez ("Martinez"). Martinez was then the President, sole director and shareholder of A.M.I.
7. On or about November 1, 1988, Martinez, as principal, an Commercial Union, acting through its duly authorized agent an attorney in fact, as surety, issued to the Town its Subdivision Bond No. CJ7127048, in the amount of $590,000.00 (the "Bond") to insure the proper completion of the Improvements. A copy of the Bond is attached to this Complaint as Exhibit A.
8. Between November 1, 1988 and November 30, 1990, Martinez, or his successors and assigns, completed construction of a portion of the improvements. Based upon work in place, on or about December 18, 1990, the Commission reduced the principal amount of the Bond from $590,000.00 to $357,000.00.
9. Martinez and/or his successors and assigns, have failed to complete construction of the Improvements in accordance with the requirements of the Subdivision approval and applicable Connecticut law.
10. The current estimated cost to complete the Improvements is $303,757.00.
11. By letter dated April 7, 1995, the Town notified Commercial Union that the Improvements had not been completed as required and called the Bond.
12. Despite demand by the Town, Commercial Union has failed and refused to honor its obligations under the Bond.
SECOND COUNT (in the alternative) (negligence) CT Page 10113
1. — 7. Paragraphs 1 through 7 of the First Count. are hereby repeated as Paragraphs 1 through 7 of this Second Count.
8. Commercial Union is in the business of providing Commercial surety bonds and accepted a premium in exchange for underwriting the Bond.
9. As set forth in the Bond itself, CQrrlmercial Union knew that undertaking was specifically related to Southington Subdivision No. 895, consisting of eleven (11) lots located on Captain Lewis Drive.
10. Proceedings of the Southington Planning and Zoning Commission with respect to the Subdivision are a matter of public record and, therefore, Commercial Union knew, or in the exercise of due care should have known, that A.M.I. and not Martinez was show as the "Applicant" for the Subdivision.
11. The Town relied upon Commercial Union's proper issuance of to Bond in allowing a portion of the Improvements to be constructed and in allowing the Subdivision Map to be recorded And lots within the Subdivision to be conveyed to third parties Commercial Union knew, or in the exercise of due care should have known, that the Town relied upon Commercial Union to properly issue the Bond.
12. If and to the extent that Martinez is held not to be the proper principal on the Bond, then Commercial Union was negligent in failing to properly issue the bond.
13. As a result of Commercial Union's negligence, the Town has been injured in the approximate amount of $303,757.00, representing the current estimated cost to complete the Improvements.
THIRD COUNT (in the alternative) (promissory estoppel)
1. — 11. Paragraph 1 through 11 of the Second Count are hereby repeated as Paragraphs 1 through 11 of this Third Count.
12. If and to the extent that Martinez is held not to be the proper principal on the Bond, then Commercial Union is estopped from denying the validity and enforceability of the Bond.
13. — 17. Paragraphs 8 through 12 of the First Count are hereby repeated as Paragraph 13 through 17 of this Third Count.
FOURTH COUNT (in the alternative) (instrumentality/identity) CT Page 10114
1. — 5. Paragraph 1 through 5 of the first count are hereby repeated as Paragraphs 1 through 5 of this Fourth Count.
6. Martinez, as the sole shareholder of A.M.I., so completely dominated and controlled the affairs of A.M.I. that the corporation was, as of the time the Subdivision Application was filed, a mere instrumentality of Martinez. For purposes of the Application and the Bond, therefore, Martinez and A.M.I. are legally one and the same.
7. — 12. paragraphs 7 through 12 of the First Count are hereby repeated as Paragraph 7 through 12 of this Fourth Count.
WHEREFORE, plaintiff claims:
1. Money damages;
2. Statutory interest; and
3. Costs.
 PLAINTIFF, Town of Southington
 By: Thomas A. Rouse Pullman Comley, LLC 850 Main Street, P.O. Box 7006 Bridgeport, CT 06601-7006 Juris #47892 330-2000
Exhibit 3
 Property #111 RTC CONNECTICUT DEED
THIS DEED is made the 27th day of June, 1995, by RESOLUTION TRUST CORPORATION, as Receiver for Old Stone Federal Savings Bank, as GRANTOR, to the Town of Southington, a municipality within the territorial limits of The County of Hartford and State of Connecticut, whose address is 75 Main Street, Town Hall, Southampton, Connecticut, as GRANTEE.
Witness that Grantor, for good and valuable consideration, receipt of which is acknowledged, remises, releases and quitclaims to Grantee all the real property located in Southampton, more particularly described as: CT Page 10115
See Exhibit "A" attached hereto and made part hereof,
together with all tenements, hereditaments and appurtenances thereto; subject to current real property taxes, zoning and other governmental restrictions, and all covenants, conditions, restrictions, easements, rights-of-way and other matters of record.
To have and to hold all said premises, with all privileges and appurtenances thereof, to the said Grantee, and its successors and assigns, to and for the use of the said Grantee, it successors and assigns forever.
IN WITNESS WHEREOF, Grantor has set its hand and seal the day and year first above written.
WITNESSES: GRANTOR:
 RESOLUTION TRUST CORPORATION, as Receiver for Old Stone Federal Savings Bank
________________________ By: ___________________________ Print Name: ___________________ Title: Attorney-In-Fact
 [ACKNOWLEDGEMENT follows] I certify that this is a true copy of the Certificate received for record
Attest Registrar
Commonwealth of Pennsylvania )) SS: County of Montgomery )
The foregoing instrument was acknowledged before me this 27th day of June, 1995, by Cynthia M. Vogt the Attorney-In-Fact for Resolution Trust Corporation as Receiver for Old Stone Federal Savings Bank.
_____________________________ (SEAL) Notary Public My commission expires: __________
NOTARAL SEAL TANYA H. FUHRMEISTER, Notary Public CT Page 10116 Bridgeport Boro. Montgomery Co. My Commission Expires Sept. 30, 1996
 EXHIBIT "A" (DESCRIPTION)
[EDITORS' NOTE: THE DESCRIPTION IS ELECTRONICALLY NON-TRANSFERRABLE.]
Exhibit 4
Honor. I'm sorry, `95. June of `95.
MR. ROUSE: After the commencement of this lawsuit.
THE COURT: Well, that's what I'm trying to find out. Was it after the commencement of this lawsuit?
MR. MERCIER: Very close in time, your Honor.
THE COURT: Before or after?
MR. MERCIER: Well, I don't have the date of service. Perhaps, Tom, You do.
MR. ROUSE: I think we have it.
MR. MERCIER: We had two different lawsuits that were filed, one in two different jurisdictions.
MR. ROUSE: It was one lawsuit, your Honor. It was transferred here by the court to New Britain for administrative convenience. First date of service, I believe, was June 16, 1995, your Honor.
THE COURT: And what was the date when they bought the property?
MR. MERCIER: June 27, `95.
THE COURT: 27th.
MR. MERCIER: Yes, your Honor.
THE COURT: Then what is the relevance?
MR. MERCIER: Well, your Honor, I'm going to get into the issue of — this witness has already $350,000. CT Page 10117
A That's correct.
Q I'm going to show you a settlement statement from the sale itself and ask if that shows, again, by way of explanation, that the bid was actually a higher amount and there was a credit given for cash purchase within 45 days.
A That's correct.
Q Okay. Does this closing statement accurately reflect the transaction?
A Yes, it does.
MR. ROUSE: I would offer that, your Honor.
MR. MERCIER: No objection.
THE COURT: What number would that be?
Plaintiff's Exhibit —
THE CLERK: 23.
THE COURT: 23?
THE CLERK: Yes, your Honor.
MR. ROUSE: No further questions, your Honor.
MR. MERCIER: I have no further questions, your Honor.
THE COURT: How much was it sold for?
MR. ROUSE: The net, I believe, if my math is correct, is $352,450.
MR. MERCIER: What are you looking at? 352 is what amount?
MR. ROUSE: That's the net amount if you —
Exhibit 5
 CONTRACT OF SALE OF READ ESTATE
[EDITORS' NOTE: THE CONTRACT OF READ ESTATE IS ELECTRONICALLY CT Page 10118 NON-TRANSFERRABLE.]
 SCHEDULE A
All that certain piece or parcel of land with any improvements theron situated in the Town of Southington, County of Hartford and State of Connecticut and shown and designated as lot no. 2 on a certain map entitled "Subdivision Plan For A.M.I. Industries, Inc. Captaion Lewis Dr., Southington, CT Scale 1" = 40' May 6, 1988 Sheet 1 of 3, 2 of 3 and 3 of 3 Rev. 8/04/88 Rev. 1/04/89" prepared by Krazert, Jones Assoc., Inc. and on file in drawer 17 as map 152 in the office of the Southington Town Clerk.
 SCHEDULE B
The following describes the scope of the project for (Name of Company/Buyer) David T. Randall as proposed for Lot 2 in the Captain Lewis Industrial Park:
• Total Square Feet of New Building: 5500 — 6000 S.F.
• estimate Date of Occupancy: Late 1996 — Early 1997
• Total Employees One Year from Certificate of Occupancy: 6
• Total Approximate Liquidation Value of Machinery/Equipment One Year from Certificate of Occupancy: $125,000.00
• Total Approximate Payroll One Year from Certificate of Occupancy:$120,000.00
 CONRACT OF SALE OF READ ESTATE
[EDITORS' NOTE: THE CONTRACT OF SALE OF READ ESTATE IS ELECTRONICALLY NON-TRANSFERRABLE.]
 SCHEDULE A
All that certain piece or parcel of land with any improvements thereon situated in the Town of Southington, County of Hartford and State of Connecticut and shown and designated as lot no. 3 on a certain map entitled "Subdivision Plan For A.M.I. Industries, Inc. Captain Lewis Dr., Southington, CT Scale: 1" = 40' May 6, 1988 Sheet 1 of 3, 2 of 3 and 3 of 3 Rev. 8/04/88 Rev. 1/04/89" prepared by Krazert, Jones Assoc., Inc. and on file in drawer 17 as map 152 in the office of the Southington Town Clerk. CT Page 10119
 SCHEDULE B
The following describes the scope of the project for (Name of Company/Buyer) Quality Realty, L.L.C. as proposed for Lot 3 in the Captain Lewis Industrial Park:
• Total Square Feet of New Building: $5,000 SF
• Estimate Date of Occupancy: September 1997
• Total Employees One Year from Certificate of Occupancy: 10
• Total Approximate Liquidation Value of Machinery/Equipment One Year from Certificate of Occupancy: $300,000
• Total Approximate Payroll One Year from Certificate of Occupancy:$300,000
[EDITORS' NOTE: THE AGREEMENT IS ELECTRONICALLY NON-TRANSFERRABLE.]
 SCHEDULE A
All that certain piece or parcel of land with any improvements thereon situated in the Town of Southington, County of Hartford and State of Connecticut and shown and designated as lot no. 10 on a certain map entitled "Subdivision Plan For A.M.I. Industries, Inc. Captain Lewis Dr., Southington, CT Scale: 1" = 40' May 6, 1988 Sheet 1 of 3, 2 of 3 and 3 of 3 Rev. 8/04/88 Rev. 1/04/89" prepared by Krazert, Jones Assoc., Inc. and on file in drawer 17 as map 152 in the office of the Southington Town Clerk.
 SCHEDULE B
Buyers plan to construct a new building to be occupied by Compumail Corp. Total square footage of the new building would be approximately 13,000 s.f., with an estimated date of occupancy of June 1998. Total employees one year from certificate of occupancy would be thirty (30), with a total approximate liquidation value of machinery of $500,000, total approximate payroll one year from certificate of occupancy would be estimated at $540,000 annually.
 CONTRACT OF SALE OF REAL ESTATE
[EDITORS' NOTE: THE CONTRACT OF SALE OF REAL ESTATE IS ELECTRONICALLY NON-TRANSFERRABLE.] CT Page 10120
 SCHEDULE A
All that certain piece or parcel of land with any improvements thereon situated in the Town of Southington, County of Hartford and State of Connecticut and shown and designated as lot no. 6 on a certain map entitled "Subdivision Plan For A.M.I. Industries, Inc. Captain Lewis Dr., Southington, CT Scale: 1" = 40' May 6, 1988 Shee 1 of 3, 2 of 3 and 3 of 3 Rev. 8/04/86 Rev. 1/04/89" prepared by Krazert, Jones Assoc., Inc. and on file in drawer 17 as map 152 in the office of the Southington Town Clerk.
 SCHEDULE B
The following describes the scope of the project for Robert A. Gannon andJanice N. Gannon as proposed for Lot 6 in the Captain Lewis Industrial Park:
• Total Square Feet of New Building: 6,000 s.f.
• Estimate Date of Occupancy: 11/1/97
• Total Employees One Year from Certificate of Occupancy: 8
• Total Approximate Liquidation Value of Machinery/Equipment One Year from Certificate of Occupancy: $70,000.00
• Total Approximate Payroll One Year from Certificate of Occupancy:$210,000.00
Exhibit 6
 objections which the Court has overruled, I have no further objection to these documents.
BY MR. MERCIER:
Q Are there negotiations for the sale of any other lots pending?
A No.
Q Based on the four lots that have been sold, is there an average price per acre for the sale of lots in the Captain Lewis subdivision?
A The average price per acre is $40,000 per acre. CT Page 10121
Q How many acres are remaining in the subdivision now on the remaining lots?
A Approximately ten.
Q Has the town filed an application to develop the property as a subdivision?
A I'm not a member of the Planning Zoning Commission and wouldn't be involved in that process, so I can't answer that.
Q Well, as part of your role as an economic development consultant did you request that an application be filed?
A That's not part of my role as an economic consultant.
Q I believe you testified that it was part of your responsibility as you would assess the project when you were looking at properties to determine whether the town might buy them and come up with a plan, is that —
Exhibit 7
economic development affairs of the town.
Q Now, are you familiar with the Captain Lewis subdivision in Southington?
A Yes.
Q And how did you become aware of that subdivision?
A When I was hired by the town in February of 1995 I was given a tour of the town by the town planner and we looked at various industrial areas in Southington and that was one of the areas we looked at.
Q Did you subsequent to February of 1995 get involved in the potential purchase of property for the town?
A Yes.
Q And who owned the property at that time?
A I believe it was the Resolution Trust Corporation
Q For what purpose was the town interested in purchasing that CT Page 10122 property?
A We were interested in doing an economic development project.
Q of what type, commercial, industrial, residential?
A Well, it's zoned industrial.
Q So it was an industrial project; is that right?
A It's an economic development project, yes.
Q What was the process for approval within the town for purchasing the property for the town?
A Again, I'm going to cover this in generality. That when a municipality purchases a piece of property, for any purpose, including economic development purposes, they need to follow the State statutes under 8-24. We call it an 8-24 project which means that you need to assess the attributes of the project and put together a project plan which goes through a very lengthy government review, local and state, to see if the project conforms to different criteria that the State and municipality look at for an economic development project. So at the local level it was reviewed by the Economic Development Commission, the Planning Zoning Commission and the Town Council.
Q As part of the plan for the purchase was there an assessment made of what the market value might be for the sale of lots by the town?
A Are you asking me if we did an appraisal?
Q Not necessarily an appraisal but it could have included an appraisal.
A No, we didn't.
Q Was there —
 THE COURT: The question was assessment of market value. Is that considered the same as an appraisal?
MR. MERCIER: No.
THE COURT: So you — so what's the answer to the market value?
MR. MERCIER: She hasn't given me — she said she did not do CT Page 10123 —
A We didn't assess any market value.
Q Did you though try to determine what the lots might be sold for?
A Again, this was an economic development project. we were interested in helping small- to mid-size manufacturers grow their businesses in Southington. So the value of the land was less important than the securing of small- to mid-size businesses.
Q What was the anticipated purchase price for the property from the RTC if the town were to buy it?
A I don't recall the RTC printing a number about what their required purchase price was.
Q I asked what you anticipated the price might be.
A We didn't anticipate a price.
Q How did the town ultimately purchase the property? Was it at auction?
A The RTC held an auction.
THE COURT: RTC?
THE WITNESS: Resolution Trust Corporation.
Q Were you present at that auction?
A Yes.
Q And did you make the successful bid for the property?
A Yes, I did.
Q Were there any other bidders?
A Yes, there were.
Q What was the limit of your authority from the town
 SCHEDULE B
CT Page 10124 Purchase Price of 17.052 acres is $352,450 ÷ 17.052 acres = $20,669 per acre
(See Par. 6 of Stipulation for Acreage) Lot 1 — 1.035 ac. Lot 2 — .92 ac. Lot 3 — 1.908 ac. Lot 4 — 1.297 ac. Totals
 Sales Price $41,200 $36,800 $76,000 $51,600 $205,600
 Cost of Purchase by Town $21,392 $19,015 $39,436 $26,807 $106,650
 Gross Profit $19,808 $17,785 $36,564 $24,793 $98,950
Less Expenses:
1. Attorneys fees for each sale $450 $450 $450 $450
2. Title insurance and other closing
 costs for each sale $260 $260 $260 $260
3. Economic Development Consultant fee
 attributable to this project — $6,041 $6,041 $6,041 $6,041
 May `95 through Sep. `97 = 2 yrs. 5 mos.
 @ $50,000 per year = $120,833 @ 50% of
 her time on this project, $60,416 + 10
 lots = $6,041/lot
4. Advertising: $15,000 + 10 lots $1,500 $1,500 $1,500 $1,500
5. Cost of money advanced from Capital $2,802 $2,802 $2,802 $2,802
 Fund; June "95 — Oct. "97 = 2 yrs. 5
 mos. @ 5% of $352,450 (p.p. ) =
 $17,622 per year Total $11,083 $11,053 $11,053 $11,053
 (a) Year 1 ............. $17,622
 (b) Year 2 is 5% of $352,450
 less sales from 4 lots of $205,600 or
 5% of $146,850 = $7,342
 (c) Smos. @ $612 per mo.= $3,060
 TOTAL:* $28,024 ÷ 10 lots =
 $2,802 per lot
6. Estimate of road completion; has not been expended;
 relied on bond to pay it. $310,000 as claimed by Town
 or $175,000 as found by Judge Allen In either case, not
 included in determining profit because it has not been
 expended.
CT Page 10125
7. Sanding, snow plowing, fix fencing, etc. — town unable
 to define.
8. Loss of tax revenue to the town while the subdivision
 has been owned by the town. The Court has not
 considered this because the town is unique as a
 developer; a private developer would not lose taxable
 income; rather it would have to pay taxes. However, if
 the Appellate Court wishes to consider them, this Court
 makes a finding of fact that they are on the 17 ± acres, as
 testified by Michelle Stronz, the Economic
 Development Consultant, as follows:
 6/95 — 1/96 $25,140
 1/96 — 10/96 $18,080
 10/96 — 10/97 $12,076
 TOTAL $55,296
9. Legal fees for creating proper advance $100 $100 $100 $100
 from Capital Fund; Day, Beny Howard
 — $1,000 + 10 lots
 SUMMARY
 Gross Profit $19,808 $17,785 $36,564 $24,793
 Less total expenses per lot $11,053 $11,053 $11,053 $11,053
 Net Profit per sale: $8,755 $6,732 $25,511 $13,740
 Total Net profit from sale of 4 lots — $54,738;
 No profit If loss of tax revenue Is an expense